IN THE COMMONWEALTH COURT OF PENNSYLVANIA

McCarl's Inc.,                          :
                        Petitioner      :
                                        :
        v.                              :  No. 322 C.D. 2021
                                        :  Submitted: March 7, 2022
Christopher J. Manzo (Workers'          :
Compensation Appeal Board),             :
                        Respondent      :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                              FILED: April 1, 2022

        McCarl's Inc. (Employer) petitions this Court for review of the February 26,
2021 order of the Workers' Compensation Appeal Board (Board), affirming the
decision of a workers' compensation judge (WCJ) that granted the claim petition of
Christopher J. Manzo (Claimant). The issues before this Court are whether Claimant
provided Employer with timely notice of the alleged work injury and whether
Claimant presented competent evidence establishing that his injury was work
related. After review, we affirm.

## I.  Background

        Claimant worked for Employer as a steamfitter from 2010 to 2018.
Reproduced Record (R.R.) at 21a.[1]  On March 7, 2019, Claimant filed a claim
petition seeking total disability benefits for a March 9, 2018 work injury, which
allegedly caused an aggravation of the preexisting degenerative arthritis in

_____

        [1] Claimant worked for multiple companies, including Employer, from 2004-2010. R.R. at
21a.

Claimant's right shoulder, necessitating a total right shoulder replacement. *Id.* at 1a-6a. Claimant indicated that he notified Employer of his work injury on December 4, 2018. *Id.* at 4a. Employer denied that Claimant suffered a work-related injury and asserted that Claimant failed to provide Employer notice of the alleged work injury within 120 days, as required by Section 311 of the Workers' Compensation Act (Act).[2] *Id.* at 8a-10a.

In support of his claim petition, Claimant testified live before the WCJ[3] and presented the deposition testimony of his orthopedic surgeon, Mark A. Gardner, D.O. Employer presented the deposition testimony of Trenton M. Gause, M.D., who performed an independent medical examination (IME) of Claimant, and Zachary Penich, Employer's environmental health and safety director.

## A. Claimant's Evidence

Claimant testified that his duties as a steamfitter required that he regularly lift and carry items weighing more than 50 pounds, and work with his arms extended overhead for long periods of time. *Id.* at 23a. Claimant earned approximately $40 per hour and worked 40 hours per week, plus overtime. *Id.* at 24a.

Claimant acknowledged that he had a history of pain and numbness in his right shoulder, beginning in 2003. *Id.* at 24a-25a, 78a. Although Claimant played recreational softball during that period, and he previously played baseball, Claimant did not relate his right shoulder symptoms to any specific incident or event; rather,

---

[2] Section 311 provides that, unless the employer knows that a claimant has sustained a work injury, the claimant must provide the employer notice of the work injury within 120 days of its occurrence. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 631. Where an employee is unaware of the work-related nature of his injury, the period for giving notice does not commence until the employee knows, "or by the exercise of reasonable diligence should know," of the relationship between the injury and his employment. *Id.*

[3] The WCJ held hearings on April 10, July 16, and October 23, 2019.

he felt they were caused by "doing overhead stuff" at work. *Id.* at 25a, 78a. Claimant underwent arthroscopic procedures in 2003, 2004, and 2007 to treat a torn labrum in his right shoulder. *Id.* at 27a, 77a-78a. Claimant resumed his full-duty job following each surgery. *Id.* at 26a.

Claimant did not require treatment for any right shoulder symptoms after 2007, and throughout the eight-year period he worked exclusively for Employer, and he had no work restrictions in the use of his right shoulder. *Id.* at 27a-28a, 50a. Claimant's right shoulder pain returned in 2017. *Id.* at 28a. He described this onset of right shoulder pain as gradual and unrelated to any specific event or trauma. *Id.* at 28a-29a. Claimant experienced difficulty performing his job duties, as his right shoulder would "get weaker a lot quicker, and [he felt] a lot of numbness." *Id.* at 29a.

On March 9, 2018, Claimant was laid off from his position with Employer due to lack of work. *Id.* at 30a. At that time, he sought treatment for his right shoulder symptoms with his primary care physician (PCP), who referred Claimant to Dr. Gardner. *Id.* at 31a. Based on Dr. Gardner's recommendation, Claimant underwent a total right shoulder replacement on August 28, 2018. *Id.* at 31a-32a.

During his initial appointment with Dr. Gardner in May 2018, Claimant related his history of right shoulder problems, and advised that he experienced right shoulder pain "during work" in 2005, but that he "took care of it." *Id.* at 52a-53a. Claimant could not recall the exact date he told Dr. Gardner that he worked as a steamfitter, and he denied having a discussion with Dr. Gardner in June 2018 that his work duties aggravated his right shoulder symptoms. *Id.* at 36a, 54a. Claimant first became aware that his right shoulder problems could be work related during a follow-up appointment with Dr. Gardner on December 4, 2018. *Id.* at 34a, 36a.

3

Following that appointment, at Claimant's request, Dr. Gardner drafted a brief report, in which he opined that Claimant's "labor intensive job" with Employer aggravated his right shoulder symptoms. *Id.* at 34a, 242a-43a. Claimant advised Employer in a December 9, 2018 letter that he was "pursuing a workers' compensation claim petition" under the Act. *Id.* at 241a. Claimant sent this letter, along with Dr. Gardner's December 4, 2018 report, for the purpose of advising Employer that he suffered a work injury. *Id.* at 109a.

Claimant stated that Dr. Gardner had not released him at any time to return to work as a steamfitter. *Id.* at 109a. Claimant admitted working as a baseball coach for the Hermitage School District, but he only provides verbal instruction, and he does not swing a bat or throw baseballs. *Id.* at 80a. Although Claimant did not believe he could return to his job as a steamfitter, he had taken a full-time job as a maintenance technician at the wastewater treatment plant operated by the city of Hermitage, earning $15.26 per hour. *Id.* at 104a-5a. Prior to accepting the maintenance technician job, Claimant discussed the physical requirements with Dr. Gardner, who released Claimant to work. *Id.* at 107a. Claimant performs some clerical work and "a little bit of cleaning." *Id.* at 104a-05a. Claimant is not required to perform any overhead work, and any heavy lifting is accomplished with a forklift. *Id.* at 105a-06a.

Claimant agreed during cross-examination that he experienced right shoulder pain while performing his work duties in 2005; however, he did not file a claim for benefits under the Act, as he was laid off at the time and he planned to "take care of it [himself]." *Id.* at 42a. Claimant's prior complaints of right shoulder pain, which resulted in three arthroscopic surgeries, were not treated as work-related. *Id.* at 112a-13a.

4

Dr. Gardner testified at an August 26, 2019 deposition that he first examined Claimant on May 9, 2018. *Id.* at 123a. At that time, Claimant related his prior history of right shoulder problems, which were addressed by arthroscopic surgery. *Id.* at 123a-24a. Dr. Gardner's findings on physical examination suggested right shoulder osteoarthritis, which Dr. Gardner felt was posttraumatic in nature. *Id.* at 124a. He administered an injection to treat Claimant's right shoulder pain symptoms, which gave Claimant some relief. *Id.* at 125a. At a subsequent appointment on June 13, 2018, Dr. Gardner reviewed the results of a June 7, 2018 magnetic resonance imaging (MRI) study that revealed "significant" osteoarthritis in the right shoulder, which Dr. Gardner believed required a total right shoulder replacement. *Id.* at 127a-28a. Dr. Gardner felt that Claimant progressed well, post-operatively, although Claimant was not "100[%]," and he still experienced some pain. *Id.* at 129a. Dr. Gardner noted that a patient having undergone a shoulder replacement is usually limited to some degree and Dr. Gardner generally recommends no lifting over 25 pounds. *Id.* at 137a-38a. He opined that Claimant would find any sustained overhead work very difficult. *Id.* at 138a.

Dr. Gardner recalled having discussed Claimant's work duties and he opined that Claimant's overhead work aggravated any preexisting shoulder problem. *Id.* at 133a-34a. Additionally, he felt that the tools Claimant described using to perform his job duties would cause reverberation throughout the shoulder and aggravate any symptoms of osteoarthritis. *Id.* at 134a. Dr. Gardner recalled that the initial discussion in which he related Claimant's symptoms to his work duties took place in November 2018, and he denied discussing the issue in June 2018. *Id.* at 134a-35a. Dr. Gardner opined that the treatment he provided Claimant, including the total

right shoulder replacement, was causally related to Claimant's work duties, which aggravated his osteoarthritis symptoms. *Id.* at 136a.

During cross-examination, Dr. Gardner agreed that he only reviewed Claimant's medical records from his second and third labral surgeries, and that he did not review Claimant's records from 2008 through 2018. *Id.* at 145a-46a. Dr. Gardner was not aware of any work restrictions Claimant might have had during that period, only that Claimant reported he struggled with some of his duties. *Id.* at 146a. He understood that Claimant had worked his full-duty job at the time he was laid off in March 2018 and Claimant had not sustained any specific work-related injury. *Id.* at 147a. Dr. Gardner agreed that Claimant advised during his initial consultation that he had suffered from right shoulder pain "on and off for 14 years." *Id.* at 148a. Dr. Gardner also agreed that Claimant had preexisting osteoarthritis in his right shoulder, which would not develop overnight. *Id.* at 149a. He maintained, however, that Claimant's osteoarthritis was posttraumatic in nature, and not caused by "everyday wear and tear[.]" *Id.* at 150a-51a. Dr. Gardner opined that posttraumatic osteoarthritis could be caused by a car accident or from a work-related injury. *Id.* at 150a. Claimant's medical history did not include the type of trauma associated with posttraumatic arthritis; however, he had a labor-intensive overhead job, which Dr. Gardner opined could cause posttraumatic disease. *Id.* at 151a.

Dr. Gardner understood from Claimant's earlier surgical records that his torn right labrum related to playing baseball. *Id.* at 152a. That issue, which was addressed in Claimant's three arthroscopic surgeries, differed from the issue Dr. Gardner addressed. *Id.* at 152a. Dr. Gardner agreed that labral surgery could lead to posttraumatic disease. *Id.* at 153a. He noted, however, that Claimant was released to his full-duty job after the second surgery in 2004. *Id.* at 155a. Surgical notes

6

from Claimant's 2007 surgery indicated the presence of osteoarthritis that did not originate from a known injury but was believed to be related to "a repetitive injury . . . from activities, sports, [etc.]"  *Id.* at 156a-57a.  The extent of Claimant's right shoulder osteoarthritis in 2007 was not clear from his medical records.  *Id.* at 156a. Dr. Gardner understood that Claimant coached baseball but that he could not pitch or throw balls without significant pain.  *Id.* at 159a-60a.

Dr. Gardner acknowledged that his December 4, 2018 report referenced a June 13, 2018 conversation in which he allegedly discussed Claimant's work duties and their relationship to his right shoulder symptoms.  *Id.* at 161a.  Dr. Gardner questioned whether that date was "an error in [his] dictation," because his office notes from June 13, 2018, did not reference such a conversation.  *Id.* at 162a.

Dr. Gardner's June 13, 2018 office note relevantly indicates as follows:

> I discussed his young age[4] in regards to total shoulder arthroplasty.  **I discussed his work and the difficulty will be to do any labor-intensive overhead work after shoulder replacement**.  He is aware of this.

R.R. at 197a (emphasis added).

Dr. Gardner agreed that he would have reviewed with Claimant what his limitations would be after surgery, but he did not discuss "how [Claimant's job] aggravated his symptoms."  *Id.* at 164a.  That conversation took place in November 2018.  *Id.* at 162a.

Ultimately, while Dr. Gardner could not say whether Claimant's original labral tear was caused by playing baseball or working as a steamfitter, he opined that

---

[4] Claimant was 46 when Dr. Gardner performed the August 28, 2018 total right shoulder replacement.  R.R. at 191a.

7

Claimant's right shoulder osteoarthritis symptoms were "absolutely aggravated" by "[w]hat he did for a living[.]" *Id.* at 167a, 170a.

## B. Employer's Evidence

Penich has worked as Employer's environmental health and safety director for approximately five years. *Id.* at 91a. In that capacity, Penich assisted with site management and with the development and implementation of safety and health initiatives. *Id.* Penich also acts as a liaison between Employer and its workers' compensation insurer for claims brought under the Act. *Id.* He advised that Employer has a formal policy in place for reporting work injuries, but that Claimant did not file a formal injury report at any time. *Id.* at 94a-95a. Penich only became aware of the alleged work injury when Claimant filed his claim petition in March 2019. *Id.* at 95a. Penich acknowledged that Employer received Claimant's December 9, 2018 letter, which was brought to Penich's attention at the time Employer received it. *Id.* at 96a, 100a. As a result, Penich admitted he was "generally aware" in December 2018 that Claimant alleged the existence of a work-related injury. *Id.* at 102a. Penich maintained, however, that Claimant failed to "formally" report a work injury. *Id.* Penich also disputed Claimant's description of his job duties, which Penich asserted did not require "overhead work most of the time." *Id.* at 98a.

Dr. Gause performed an IME of Claimant on May 30, 2019, during which Claimant complained of intermittent mild right shoulder pain with a decreased range of motion. *Id.* at 254a, 258a. Claimant related that his recurrent right shoulder pain developed approximately two years prior. *Id.* at 254a-55a. Dr. Gause noted that Claimant had a "significant" history of surgeries to correct his right labral tear and that Claimant had not suffered any traumatic events at work that would have caused

8

his symptoms. *Id.* at 255a. Dr. Gause's physical examination confirmed Claimant's decreased range of motion. *Id.* at 260a. Dr. Gause opined that Claimant's right shoulder symptoms were solely related to his preexisting degenerative condition and not to his work duties. *Id.* He based his opinion primarily on the absence of any reported work injury. *Id.* at 261a. Dr. Gause also considered Claimant's preexisting right shoulder pain and his surgical history, after which Claimant developed osteoarthritis. *Id.* at 261a, 263a. Moreover, Claimant's surgeries addressed a labral tear, which would have created instability in his right shoulder and damage to the cartilage. *Id.* at 261a. Such a circumstance would "set [Claimant] up for arthritis . . . with or without his job activities." *Id.* Dr. Gause also felt Claimant's right shoulder was negatively impacted by Claimant's baseball-related activity. *Id.* at 264a. Dr. Gause did not disagree with Dr. Gardner's diagnosis as to the condition of Claimant's right shoulder, only that Claimant's symptoms were in any way related to his work duties. *Id.* at 265a-66a. Based on his review of Claimant's medical history, however, Dr. Gause believed that Claimant's symptoms were solely related to his sports-related activities. *Id.* at 266a.

Dr. Gause conceded that Claimant did not treat for any reported right shoulder pain after the 2004 surgery until 2007, when he underwent a third labral repair. *Id.* at 271a. He also agreed that Claimant did not seek treatment for any right shoulder symptoms from 2008 until 2018, and that he did not have any work restrictions during that period. *Id.* at 271a-72a. Dr. Gause did not agree, however, that Claimant's job duties involved heavy labor, which Dr. Gause characterized as lifting up to 100 pounds. *Id.* at 273a. He did not consider lifting 50 pounds "heavy" labor. *Id.* Although Dr. Gause admitted that an individual with preexisting shoulder problems would experience pain when moving that shoulder, he maintained that

9

such movement would not exacerbate the condition of that shoulder or cause a progression of the arthritis in that joint. *Id.* at 274a-75a. In his IME report, Dr. Gause opined that any injury sustained by Claimant on March 9, 2018, was "no more than a [shoulder] strain[,]" that Dr. Gause would expect to have resolved within "six weeks or so." *Id.* at 292a.

## C. WCJ Decision

The WCJ granted Claimant's petition in a decision circulated on January 24, 2020. R.R. at 320a. He credited Claimant's live testimony regarding his symptoms and the difficulties he experienced because of his work activities, which were supported by the nature of Claimant's employment and the testimony of Dr. Gardner. *Id.* at 318a. Both Claimant and Dr. Gardner acknowledged that Claimant had an extensive history of right shoulder issues; however, Claimant worked for approximately eight years before he experienced the symptoms giving rise to the instant litigation. *Id.* Claimant's considerable period of employment with Employer supported Claimant's contention that his work duties exacerbated the condition of his right shoulder to the point where it required surgical intervention from Dr. Gardner. *Id.* While the WCJ acknowledged that, given Claimant's medical history, Dr. Gause's conclusions regarding the cause of current symptoms were reasonable, the WCJ ultimately credited Dr. Gardner's opinions over those of Dr. Gause. *Id.*

The WCJ also credited Claimant's testimony that he was unaware that his right shoulder symptoms related to his job duties until advised by Dr. Gardner. *Id.* The WCJ found that Claimant's testimony was supported by Dr. Gardner's June 13, 2018 office note, as Dr. Gardner *did not* comment on the work-related nature of Claimant's symptoms. *Id.* Accordingly, the WCJ found that Claimant provided Employer timely notice of his work injury as required by Section 311 of the Act. *Id.*

10

The WCJ awarded Claimant total disability benefits from March 9, 2018, through August 5, 2019, after which Claimant would receive partial wage loss benefits based on his current employment for the city of Hermitage. *Id.* at 321a. Employer was entitled to a credit for any unemployment compensation or short-term disability benefits paid in lieu of workers' compensation. *Id.*

Employer appealed to the Board, which affirmed. One member of the Board dissented, agreeing with Employer that Claimant failed to provide timely notice of the work injury. *Id.* at 338a-39a. This appeal followed.[5]

## II. Issues

Employer argues that the WCJ erred in concluding that Claimant provided timely notice of the alleged work injury and erred in granting Claimant's claim petition, as Dr. Gardner's testimony was not competent.

## III. Discussion

## A. Notice under Section 311 of the Act

Timely notice of a work-related injury is a prerequisite to receiving workers' compensation benefits, and the claimant bears the burden of showing that proper notice was given. *East Hempfield Twp. v. Workers' Comp. Appeal Bd. (Stahl)*, 189 A.3d 1114, 1117 (Pa. Cmwlth. 2018). Unless the employer has knowledge of the work injury, Section 311 of the Act requires that the employee give notice of the work injury within 120 days of its occurrence. 77 P.S. § 631. Where the injury, and its connection to the claimant's employment, is not known, the notice period in

---

[5] Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704; *Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap)*, 81 A.3d 830, 838 (Pa. 2013). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *McCabe v. Workers' Comp. Appeal Bd. (Dep't of Revenue)*, 806 A.2d 512 (Pa. Cmwlth. 2002).

Section 311 does "**not begin to run until the [employee] knows, or by the exercise of reasonable diligence should know, of the existence of the injury and its possible relationship to his employment.**" 77 P.S. § 631 (emphasis added).

The critical issue to be determined is not when a claimant actually knew of the work-relatedness of his injury, but when the claimant, "through the exercise of reasonable diligence, *should have known* the work-relatedness of his injury." *Stahl*, 189 A.3d at 1120 (emphasis in original). Reasonable diligence requires "a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case." *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246, 1251 (Pa. 2001). While reasonable diligence is an objective standard, it considers the different capacities employees have to deal with the circumstances they confront. *Stahl*, 189 A.3d at 1118. Section 311's discovery rule "calls for more than an employee's suspicion, intuition or belief . . . ." *Sell*, 771 A.2d at 1253.

Whether a claimant has complied with Section 311's notice requirement is a question of fact to be determined by the WCJ. *City of Philadelphia v. Workers' Comp. Appeal Bd. (Wilson)*, 767 A.2d 26, 29 (Pa. Cmwlth. 2001). The WCJ has exclusive province over questions of credibility and evidentiary weight. *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013). The WCJ may accept or reject the testimony of any witness, including a medical witness, in whole or in part. *Id.* This Court's role is not to reweigh the evidence or review the credibility of the witnesses. *Sell*, 771 A.2d at 1251. Whether the record contains evidence to support findings other than those made by the WCJ is irrelevant; the critical inquiry is whether the record supports the findings actually made. *A & J Builders*, 78 A.3d at 1238. We must view the evidence in the light most favorable to the prevailing party and give it the benefit of

12

all inferences reasonably deduced therefrom. *Id.* at 1239. As always, we are mindful that the Act is remedial in nature and must be construed to effectuate its humanitarian objectives. *Maple Creek Mining Co. v. Workers' Comp. Appeal Bd. (Bakos)*, 833 A.2d 1198, 1199 (Pa. Cmwlth. 2003). Borderline interpretations of the Act are to be construed in favor of the injured worker. *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.)*, 834 A.2d 524, 528 (Pa. 2003).

Instantly, Employer argues that Claimant failed to establish that he provided timely notice of his work injury. Employer's position is twofold. First, Employer asserts that Claimant provided no notice of the alleged work injury whatsoever, as Claimant admitted during testimony that he neither reported his shoulder symptoms to Employer nor reported any work-related shoulder injury throughout the course of his employment. Second, Employer asserts that, even if Claimant notified Employer of the alleged work injury in December 2018, Claimant knew of the possible link between his right shoulder symptoms and his work duties in June 2018. Under either scenario, Claimant failed to provide timely notice of his work injury. Employer also notes that the WCJ's finding that Claimant first discussed causation with Dr. Gardner in December 2018 contradicts Dr. Gardner's testimony that he broached the subject in November 2018.

Employer's argument fails on the first point, as it ignores the WCJ's express finding that Claimant was unaware until December 2018 that his shoulder symptoms were work related. Employer is correct that Dr. Gardner testified he believed a discussion regarding the impact of Claimant's work duties took place in November 2018. This is irrelevant, however, as Claimant indisputably sent Employer a letter in December 2018 indicating that he intended to pursue a "workers' compensation claim petition" under the Act. R.R. at 241a. Employer's own witness, Penich,

13

bolsters the WCJ's finding in this regard. Penich's testimony that he did not know about Claimant's alleged work injury until he filed a claim petition on March 7, 2019, is entirely undone by Penich's subsequent admission that Claimant's December 9, 2018 letter was brought to his attention after Employer's receipt thereof. Therefore, Penich was "generally aware" in December 2018 that Claimant alleged the existence of a work-related injury. *Id.* at 102a. Employer's argument strains credulity considering this acknowledgement by Penich, Employer's self-professed liaison between Employer and its insurer for workers' compensation matters. Claimant's failure to file an injury report by the formal means Employer dictated does not defeat the written notification that Claimant sent, and which Employer admitted it received.

We must also reject Employer's argument that Claimant was aware in June 2018 of the relationship between his job and his shoulder symptoms, as these findings are based on the WCJ's credibility determinations, and the documentary evidence presented. During his deposition testimony, which the WCJ credited, Dr. Gardner suggested that the reference to June 2018 in his December 4, 2018 report was "an error in dictation," given that the actual office note from June 13, 2018, contained no such reference. *Id.* at 162a. This note indicates that Dr. Gardner and Claimant "discussed [Claimant's] work" and the likelihood that Claimant would encounter difficulty performing "labor-intensive overhead work after shoulder replacement." *Id.* at 197a. While this language clearly suggests that Claimant may not be able to resume his job duties with Employer, it does not establish that Claimant and Dr. Gardner discussed a causal relationship between Claimant's shoulder pain and his job.

14

Moreover, in light of Claimant's 14-year history of right shoulder problems that predated his continuous period of work for Employer, which included three surgeries to treat a labral tear that Claimant did not consider work related, we do not perceive that Claimant failed to exercise reasonable diligence in discovering the cause of his right shoulder complaints.

## B. Competency of Medical Expert

Next, we address Employer's argument that Dr. Gardner's opinions were incompetent and insufficient to support the WCJ's finding that Claimant sustained a work injury. Employer contends that Dr. Gardner's opinion of causation was in part based on an incorrect understanding of Claimant's work duties. Employer also challenges Dr. Gardner's conclusion that Claimant's labral surgeries were necessitated by his work activities. A medical expert's testimony is incompetent if it is based on an incomplete and inaccurate medical history. *Kemps v. Workers' Comp. Appeal Bd. (Steets)*, 257 A.3d 1271, 1278 (Pa. Cmwlth. 2021) (internal citations omitted).

We discern no merit in Employer's arguments. As to Claimant's work duties, Claimant testified that he regularly lifted and carried items weighing in excess of 50 pounds and he worked with his arms extended overhead for long periods of time. The WCJ credited this testimony, which was only controverted by Penich's testimony that he did not believe Claimant performed "overhead work most of the time." R.R. at 98a. Dr. Gardner testified that he and Claimant discussed the specific tools Claimant used in his work, some of which caused reverberations through the shoulders. *Id.* at 134a. Employer did not present any evidence disputing Dr. Gardner's understanding of Claimant's work duties, or the tools he used in performing those duties.

15

Moreover, Employer has mischaracterized Dr. Gardner's testimony regarding his opinion on the cause of Claimant's labral tear. Dr. Gardner acknowledged that he could not state "[w]ith medical certainty" whether Claimant's labral tear was "caused by steamfitting as much as it was caused by baseball[.]" R.R. at 170a. He unequivocally opined, however, that regardless of the cause of Claimant's labral tear, his right shoulder "condition was aggravated by his overhead activity" at work. *Id.* at 172a.

Employer's challenge to the competency of Dr. Gardner's testimony and opinions is essentially borne from a desire for a different outcome, which is not a sufficient basis for this Court to overturn the WCJ's creditability determinations.

## IV. Conclusion

The WCJ's finding that Claimant provided timely notice as required by Section 311 of the Act is supported by substantial evidence. Dr. Gardner's opinion that Claimant's work duties aggravated the preexisting osteoarthritis in his right shoulder is both competent and supported by the record. Accordingly, we affirm the Board.

_____
ELLEN CEISLER, Judge

Judges Fizzano Cannon and Dumas did not participate in the decision of this case.

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

McCarl's Inc.,                       :
             Petitioner         :
                               :
       v.                   : No. 322 C.D. 2021
                               :
Christopher J. Manzo (Workers'   :
Compensation Appeal Board),    :
                Respondent     :

# **O R D E R**

AND NOW, this 1st day of April, 2022, the February 26, 2021 order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge